IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

DAVID HARRIS                                                    PLAINTIFF

V.                                                    CAUSE NO.: 1:12CV233-SA

COOPER MARINE & TIMBERLANDS
CORPORATION                                                    DEFENDANT

MEMORANDUM OPINION

Defendant Cooper Marine & Timberlands Corporation has filed a Motion to Strike and

Exclude Portions of the Expert Testimony of Captain John Timmel [54] and a Motion for Summary

Judgment [56] in this case.

After reviewing the briefs, case law, and authorities cited, the Court finds as follows:

*Factual and Procedural Background*

On September 29 or 30 2011,[1] Plaintiff David Harris and three passengers were traveling

southbound on the Tennessee-Tombigbee Waterway ("Tenn-Tom") in Plaintiff's recreational

vessel the M/V Moonstruck. The Moonstruck was following another recreational vessel, the M/V

Branch'N Out. On the same date, the M/Y Chippewa, a tow owned by Defendant Cooper Marine

& Timberlands Corporation, was pushing eight barges in a northbound direction.

After clearing the Tom Bevill Locks, the Branch'N Out made arrangements with Chippewa

Captain David Joiner to pass port-to-port. Joiner testified that based on his prior local knowledge,

he ran the Chippewa close to the red buoy side of Mile 317 due to shallow water on the green side.

The Branch'N Out passed the Chippewa port-to-port without incident. The Moonstruck, piloted

---

[1] There seems to be some dispute as to the actual date of the collision, although the parties have not highlighted
those disputes as material to this motion.

by Terri Pruitt, proceeded southbound on the green buoy side of the Tenn-Tom and passed without incident.  However, shortly after clearing the stern of the Chippewa, the Moonstruck capsized.

Plaintiff filed this claim asserting that as the Moonstruck and the Chippewa passed each other, the Captain of the Chippewa engaged full horsepower thereby creating a "large and dangerous wake" that affected the Moonstruck.  According to the Complaint, the Chippewa's increase in speed pulled water out from under the Moonstruck, causing it to capsize and sink. Plaintiff and his passengers were able to escape the capsized vessel and boarded the Chippewa. Plaintiff contends that Captain David Joiner apologized for pulling the water out from under the Moonstruck.

Plaintiff claims Defendant was negligent in failing to exercise the standard of care necessary, negligently inflicted emotional distress, and violated maritime statutes regarding the standard of care owed on navigable waters.

Plaintiff designated Captain John Timmel as an expert in safe tugboat operations and yachting practices.  Defendant seeks to strike several opinions Timmel made as to causation in this case based on his report, supplement, and deposition.  Defendant further requests summary judgment on the basis that Plaintiff can show no genuine dispute of material fact on his claims.

*Motion to Strike Expert's Opinions*

The admissibility of expert testimony is governed by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and the post-Daubert amendments to Federal Rule of Evidence 702. See Guy v. Crown Equip. Corp., 394 F.3d 320, 325 (5th Cir. 2004). That Rule now states the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

      (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

      (b)  the testimony is based on sufficient facts or data;

      (c)  the testimony is the product of reliable principles and methods; and

      (d)  the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

The purpose of Rule 702 is to guide the district court's gatekeeping function. See Guy, 394 F.3d at 325. Before allowing a witness to testify as an expert, a court "must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" Wilson v. Woods, 163 F.3d 935, 937 (5th Cir. 1999) (quoting FED. R. EVID. 702). Further, the fact that a proposed witness is an expert in one area does not qualify him to testify as an expert in all related areas. See id. at 938. Therefore, "[a] district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." Id. at 937 (citation omitted).

A court's gatekeeping function also involves ensuring that "the expert uses reliable methods to reach his opinions," and that those opinions are "relevant to the facts of the case." Guy, 394 F.3d at 325. "Reliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid. Relevance depends upon whether that reasoning or methodology properly can be applied to the facts in issue." Knight v. Kirby Inland Marine Inc., 482 F.3d 347, 352 (5th Cir. 2007) (quotation marks, citations, and brackets omitted); see also United States v. Fields, 483 F.3d 313, 342 (5th Cir. 2007). The party offering the expert bears the burden of establishing reliability by a preponderance of the evidence. Moore v. Ashland Chem., Inc., 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

In Daubert, the Supreme Court described several non-exclusive factors that trial judges should consider in gauging reliability, including whether the proposed technique or theory can be or has been tested, whether it has been subjected to peer review and publication, whether its error rate is acceptable, whether the theory is generally accepted in the scientific community, and whether there are standards controlling the technique. See Guy, 394 F.3d at 325; Knight, 482 F.3d at 351. It later instructed that "the reliability analysis must remain flexible: not every Daubert factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." Guy, 394 F.3d at 325 (citation omitted); see Hathaway v. Bazany, 507 F.3d 312, 318 (5th Cir. 2007). The Fifth Circuit has quoted with approval the Seventh Circuit's observation that "[u]nder the regime of Daubert a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." Moore, 151 F.3d at 278 (quotation marks and citation omitted).

The Daubert analysis applies to the process of the expert's conclusions, not the merits of the conclusions themselves. Guy, 394 F.3d at 325. The merits remain subject to attack at trial under traditional principles of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Daubert, 509 U.S. at 596. "[I]n determining the admissibility of expert testimony, the district court should approach its task with proper deference to the jury's role as the arbiter of disputes between conflicting opinions." United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., State of Miss., 80 F.3d 1074, 1077 (5th Cir. 1996) (quotation marks and citation omitted). As a general rule, "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than

its admissibility and should be left for the jury's consideration." Id. (quoting Viterbo v. Dow Chem. Co., 826 F.2d 420, 422 (5th Cir. 1987)).

Defendant challenges Timmel's opinions that the Chippewa was proceeding at an unsafe speed when passing the Moonstruck, the Chippewa created an unreasonably large wake, and the wake generated by the Chippewa caused the Moonstruck to capsize.

According to Timmel, "[t]he Tug Chippewa and her tow were proceeding at an unsafe speed for the circumstances when meeting the M/Y Moonstruck." The Chippewa's "unsafe speed" "also created a wake that struck the M/Y Moonstruck causing the vessel to capsize after it lost control." Indeed, Timmel opined in his expert report that

> [a] wake the size that would be necessary to capsize a vessel the size and type of the M/V MOONSTRUCK could only have been generated by the Tug CHIPPEWA proceeding at a speed greatly excessive for the geography and bathymetry of the waterway in which it was operating in consideration of the vessel's draft in relation to the available depth of water.

Further, Timmel claimed that Captain Joiner should have "had regard for the unsafe speed at which he or she was operating the vessel, been aware of the dangerously large wake the vessel was producing, and slowed to a safe speed – one at which the Tug CHIPPEWA was not generating a dangerous wake." In conclusion, Timmel noted that "the proximate cause of the capsizing of the M/V MOONSTRUCK was encountering an unusually large and dangerous wake generated by the Tug CHIPPEWA when they met on the Tennessee-Tombigbee Waterway between MM 317.0 and MM 317.5."

However, when questioned about a reasonable speed for the Chippewa, Timmel testified that it was his opinion that the Chippewa should have been proceeding "[a]t a speed that did not create a dangerous wake." He further noted that he did not have an opinion as to the appropriate speed of the Chippewa because "speed is specific to the vessel and its characteristics, the

configuration of the tow, and the depth and bathymetry of the area of channel where it was." Timmel stated that he had not undertaken any effort to determine an appropriate speed on the day of the incident using those traits. He noted that he does not have the experience necessary to calculate those speeds. He further admitted to having no local knowledge or experience with the bathymetry and characteristics around mile marker 317 of the Tenn-Tom Waterway.

Moreover, Timmel testified as follows:

> Q: So is it your testimony that the Chippewa was proceeding at an unsafe speed simply because the accident occurred?
>
> A: Simply because it created the conditions in which caused the accident, yes.
>
>     \*      \*      \*
>
> Q: Opinion C states that, "The Tug Chippewa and her tow were proceeding at an unsafe speed for the circumstances when meeting the M/Y Moonstruck." Did I read that correctly?
>
> A: Yes.
>
> Q: And what is the factual basis for that opinion?
>
> A: That the wake of the Chippewa caused the Moonstruck to capsize and sink.
>
> Q: And, in your opinion, the only way that could've happened is if the Chippewa was proceeding at an excess - - an unsafe speed; is that right?
>
> A: Based on the evidence that I've reviewed, yes.
>
> Q: And I think we talked about this earlier, but can you tell me what speed the Chippewa should've been proceeding at on the day of the incident?
>
> A: At speeds lower than it was.

When asked later about the wake size generated on the day in question, Timmel testified that he did not have any factual information or evidence or any testimony regarding the size of the wake on the day of capsizing, had done no testing or experiments to determine the size of wake

that would have been put off by the Chippewa under conditions similar to those existing on the day of capsizing, and in fact, based his opinion that there was an extraordinarily and dangerously large wake on the fact that the Moonstruck was moving along just fine and then capsized for no other reason that he could determine.  In particular, he was asked, "How large would a wave have to be to capsize the Moonstruck?"  Timmel answered, "Well, it depends upon a number of factors, including what angle the vessel is struck by, and also the – how the vessel was loaded in terms of how the wakes on the vessel were distributed, and whether there was fuel in the tanks down below and so forth . . . There's too many variables involved."  He admitted that he had not undertaken any scientific or mathematical calculation as to the size of the wake, and based his opinion of the wake size generated solely on his experience. Timmel testified as follows:

> Q:  . . . where did you get the information that the Chippewa was generating extraordinarily and dangerously large wake?
>
> A:  By extrapolation. . . .
>
> Q:  Do you have any factual information or evidence or any testimony regarding the size of the wake on the day of capsizing?
>
> A:  No.
>
> Q:  Have you done any type of testing or experiments to determine the size of the wake that would have been put off by the Chippewa under conditions similar to those existing on the day of the capsizing?
>
> A:  No, I have not.
>
> Q:  . . . So is the basis for your opinion that there was an extraordinarily and dangerously large wake the fact that the Moonstruck was moving along just fine and then capsized for no other reason that you can determine?
>
> A:  That's right.

Timmel acknowledged he did not know the hydrodynamics of the wake created by the Chippewa in particular, and had no knowledge of the bathymetry of the Tenn-Tom Waterway at

mile marker 317. He acknowledged that pilots were very "port specific" and garnered local knowledge on a particular waterway for use in navigation. Timmel admitted that he has never operated a vessel on the Tenn-Tom Waterway, and in fact, never been on the Tenn-Tom Waterway at all.

The Court finds these opinions from Captain Timmel to be unscientific speculation. Moore, 151 F.3d at 278. No tests or mathematical equations were performed to determine the speed at which the Chippewa was proceeding or the wake size generated. Timmel's opinion regarding the causation of the capsizing has no foundation in scientific reasoning and the process of Timmel's conclusions is not reliable. Timmel relies only upon his "experience," while acknowledging that local knowledge and port specific experience, of which he is admittedly lacking, would be necessary to make those calculations. None of the Daubert factors to gauge reliability are present as to these outlined opinions. Accordingly, the Court finds that Captain John Timmel's opinions regarding the Chippewa's unsafe speed and creation of a dangerous wake as causative of the incident at issue here should be struck as speculative.

<em>Motion for Summary Judgment Standard</em>

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when the evidence reveals no genuine dispute regarding any material fact and the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323, 106 S. Ct. 2548. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324, 106 S. Ct. 2548 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). However, conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002); SEC v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1997); Little, 37 F.3d at 1075.

*Discussion and Analysis*

Defendant Cooper Marine & Timberlands Corporation moves for summary judgment contending that Plaintiff (1) cannot prove that the Chippewa created an unreasonably dangerous wake; (2) cannot provide credible evidence that the Chippewa was traveling at an unsafe speed; and (3) cannot prove that his injury and damages were caused by the negligent operation of the Chippewa. Defendant cites the undisputed evidence that Captain Joiner was operating the Chippewa at one quarter throttle, which he testified would be about three to three and a half miles per hour. Joiner testified that due to his local knowledge of the area, he had to run the Chippewa very slowly through Mile 317. Moreover, the witnesses at the scene on the date of the incident described the wake as "non-existent," a "boil in the water," or very minimal.

a. Unreasonable Wake

General negligence principles apply in personal injury claims resulting from wakes from passing vessels. Moran v. The M/V Georgie May, 164 F. Supp. 881, 885 (S.D. Fla. 1958); Maxwell v. Hapaq-Lloyd Akt., Hamburg, 862 F.2d 767, 769 (9th Cir. 1988). A passing vessel owes a duty of reasonable care to appreciate the reasonable effect of its wake and to take reasonable precautions to avoid creating unusual swells that may cause injury. Morris v. Paradise of Port Richey, Inc., 2009 U.S. Dist. LEXIS 38706, at *5-6 (M.D. Fla. Apr. 22, 2009); Turner v. Pleasant, 2004 U.S. Dist. LEXIS 1061, 2004 WL 169801 (E.D. La. 2004); Gregg v. Weeks Marine, Inc., 2000 U.S. Dist. LEXIS 7636, 2000 WL 798493 (E.D. La. 2000). Only "unusual" swells or suction which cannot be reasonably anticipated furnish the basis for a claim. Gregg, 2000 U.S. Dist. LEXIS 7636, 2000 WL 798493; Maxwell, 862 F.2d at 769. The injured plaintiff must prove by a preponderance of the evidence that the passing vessel failed to exercise reasonable care that an ordinary reasonable and prudent person would have used under similar circumstances. Id.; Barthelemy v. Petro. Co., 1999 U.S. Dist. LEXIS 1501, 1999 WL 65024, at *3 (E.D. La. 1999). Whether a vessel is responsible for damages caused by her swells depends on the facts and circumstances of each particular case. State Bank & Trust Co. of Golden Meadow v. Del-Co Marine, Inc., 1981 A.M.C. 1301, 1304 (E.D. La. 1980); Gregg, 2000 U.S. Dist. LEXIS 7636, 2000 WL 798493; Moran, 164 F. Supp. at 885.

Captain Joiner's testimony is that upon passing the Moonstruck, he was not throwing a wake. Plaintiff agrees and testified that the barge was producing a "very minimum wake for a barge that size." Upon passing the Chippewa and immediately prior to capsizing, Plaintiff could not recall any wake coming from the Chippewa. Terri Pruitt noted that the wake was "more like prop wash,"

and "more like a boil in the water than a wake." Accordingly, Plaintiff has failed to present evidence that the Chippewa was producing an "unusual swell" such that it caused injury.

b. Unsafe Speed

The testimony from Captain Joiner is that the Chippewa was proceeding at a speed of three to three and a half miles per hour while traversing Mile 317 of the Tenn-Tom Waterway. Plaintiff has failed to rebut this estimation of speed. Defendant's expert opined that the Chippewa was proceeding at a safe speed and in compliance with the Inland Rules of the Road when it passed the Moonstruck. Plaintiff offered no evidence to contradict the Defendant's expert, and thus has failed to create a genuine dispute of material fact that the Chippewa's speed was unreasonable under the circumstances.

c. Causation

Lastly, Defendant contends that Plaintiff cannot show a genuine dispute of material fact as to whether the Chippewa "sucked the water out" from the Moonstruck, causing it to capsize. Defendant's expert, Arthur Sergeant, a Naval Architect and Marine Engineer, opined that the Chippewa drew water in from the front and sides and then pushed water out of the stern. According to Sergeant, immediately prior to capsizing, the Moonstruck was in a position where the Chippewa was no longer drawing water, and indeed, was actually pushing water out from its stern. Therefore, he contends that the fact that Plaintiff capsized after clearing the stern of the Chippewa precludes Plaintiff's theory that the Chippewa sucked the water out from under the Moonstruck.

Plaintiff contends that upon boarding the Chippewa after the Moonstruck capsized, Captain Joiner apologized for pulling the water out from under the Moonstruck.

Plaintiff has surpassed his burden of showing that there is a genuine issue for trial.  The Court finds there is a genuine dispute of material fact as to whether the Chippewa sucked the water out from under the Moonstruck, thereby causing that vessel to capsize.

*Conclusion*

Defendant's Motion to Strike [54] is GRANTED.  The Motion for Summary Judgment [56] is GRANTED IN PART and DENIED IN PART.

SO ORDERED, this the 8th day of May, 2014.

**/s/ Sharion Aycock**
**U.S. DISTRICT JUDGE**